O'STEEN &HARRISON
ATTORNEYS AT LAW

Lincoln Combs, Esq. – State Bar #025080
**O'STEEN & HARRISON, PLC**
300 W. Clarendon Ave., Suite 400
Phoenix, Arizona 85013-3424
T: (602) 252-8888 F: (602) 274-1209
lcombs@vanosteen.com
saugeri@vanosteen.com
*Attorneys for Plaintiff*

Marcus J. Bradley, Esq. (CA SBN 174156, Pro Hac Vice Pending)
Kiley L. Grombacher, Esq. (CA SBN 245960, Pro Hac Vice Pending)
Lirit A. King, Esq. (CA SBN 252521, Pro Hac Vice Pending)
**BRADLEY/GROMBACHER, LLP**
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
T: (805) 270-7100 F: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com
lking@bradleygrombacher.com
*Attorneys for Plaintiff Charles Chacon*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE STATE OF ARIZONA

| | |
|---|---|
| Charles Chacon, an individual, and on behalf of classes of similarly situated individuals,<br><br>                    Plaintiff,<br><br>v.<br><br>Yuma Regional Medical Center, an Arizona nonprofit corporation,<br><br>                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**(Jury Trial Demanded)** |

This is a lawsuit against Yuma Regional Medical Center, an Arizona Nonprofit Corporation ("YRMC" or "Defendant"), which owns and operates healthcare facilities and hospitals that use computer systems to store highly sensitive and highly confidential information

O'STEEN&HARRISON
ATTORNEYS AT LAW

about current and former customers, including Social Security numbers ("SSNs"), health insurance identification number, demographic information medical information, which they are required and duty bound to safeguard from unauthorized disclosure and theft. Plaintiff, Charles Chacon ("Plaintiff") seeks remedies on behalf of himself individually and on behalf of a Nationwide Class as defined below, arising from Defendant's failure to adhere to their duties and responsibilities resulting in, and associated with, a data breach affecting hundreds-of-thousands of individuals that received healthcare from Defendant's direct or affiliated doctors or were their consumers, and Defendant's failure to immediately and accurately notify all interested parties in order to prevent them from becoming victims of or otherwise being damaged by identity theft. The facts and information alleged herein are based upon an investigation by counsel. Plaintiff believes that further substantial evidentiary support for the allegations herein will exist after a reasonable opportunity for further investigation and discovery. In support of this complaint against YRMC, Plaintiff alleges on information and belief as follows:

## I.    INTRODUCTION

1.    The increasing frequency of cyber-attacks on the healthcare industry is a matter of considerable concern and importance. In 2021, Ponemon Institute, an independent cyber-security research institution, reported that approximately 67 percent of patient care organizations have now been victims of ransomware attacks, with 33 percent having already been hit at least twice and Identity Theft Research Center reported that Personal Health Information ("PHI") accounted for the second most type of data compromised, only after SSNs.[1]

2.    In 2020, the United State Federal Bureau of Investigation warned the healthcare

---

[1] *See* Ponemon Institute LLC, The Impact of Ransomware on Healthcare during COVID-19 and Beyond (Sep. 2021), available at https://www.censinet.com/wp-content/uploads/2021/09/Ponemon-Research-Report-The-Impact-of-Ransomware-on-Healthcare-During-COVID-19-and-Beyond-sept2021-1.pdf (last accessed Jun. 15, 2022). Identity Theft Resource Center, Data Breach Reports available at https://www.idtheftcenter.org/wp-content/uploads/2022/04/ITRC_2021_Data_Breach_Report.pdf (last accessed Jun. 15, 2022).

O'STEEN & HARRISON
ATTORNEYS AT LAW

industry about increased and imminent cybercrime threat to U.S. hospitals and healthcare providers.[2] Healthcare providers and companies like YRMC were unquestionably aware of the risk of cyber-attack at all times material. Still, healthcare organizations like YRMC continue to ignore these trends and warnings and fail to take steps that are adequate and necessary to protect patient, consumer and employee confidentiality and maintain data security.

3.      Despite these known trends, risks and warnings, the healthcare industry has experienced several high profile and reported cyber-attacks exposing confidential personal and identifying information regarding healthcare patients, including data breaches of well-known health care providers, health industry entities and healthcare insurers, including Anthem, FPS Medical Center, and UCLA Medical Center, to name a few.

4.      YRMC owns and operates numerous healthcare facilities across Yuma County. These include hospitals as well as laboratories, outpatient centers, family clinics, rehabilitation centers and specialized care clinics.

5.      As part of its business, YRMC has collected and, continues to collect, personally identifying information ("PII") and protected health information ("PHI") from its patients at its facilities. In doing so, YRMC explicitly and implicitly promises, represents, and warrants that it will respect and ensure the privacy and confidentiality of that information.

6.      The PII and PHI provided to YRMC by Plaintiff and other Class Members was required to be held in the strictest of confidence and includes names, dates of birth, addresses, physician names, dates of service, clinical information, health insurance information, and Social Security numbers.

7.      YRMC knew at all times material that the data it collected and stored constituted

---

[2] *See* Cybersecurity and Infrastructure Security Agency et al., Joint Cybersecurity Advisory: Ransomware Activity Targeting the Healthcare and Public Health Sector (Oct. 2020), available at https://www.cisa.gov/uscert/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last accessed Jun. 15, 2022).

O'STEEN & HARRISON
ATTORNEYS AT LAW

highly sensitive personal and health information and that it bore the crucial responsibility to protect this information from compromise and theft. Defendant is acutely aware that health care providers, such as YRMC, are consistently required to protect their customers PII and PHI and, to that end, adopt and implement data security regulations and standards, including adhering to the Health Insurance Portability and Accountability Act ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act ("HITECHA"), applicable state law and common law.

8.    Defendant held itself out to their customers and patients as safeguarding and protecting their PII and PHI from disclosure and issued privacy policies conveying such an impression and assurances; defendant also recognized that it was required by law to do so.[3]

9.    Despite the knowledge of and warnings regarding this significant risk, YRMC — one of the largest healthcare providers in Arizona — failed to fulfill its legal duty to protect the sensitive and confidential information of its customers and patients, including plaintiff. In April 2022, hackers obtained access to YRMC's network. The hackers were able to access and obtain contained certain patient information, including names, Social Security numbers, health insurance information and limited medical information between approximately April 21, 2022 through April 25, 2022. Worse yet, YRMC failed to take adequate steps and precautions to protect and segregate its systems and servers containing the PII and PHI of patients from its network. As a result of this inexplicable lack of a fundamental system safeguard, these hackers were also able to access broader information systems and specifically the PII and PHI of as many as approximately 700,000 individuals.[4]

10.    It was not until approximately June 2022, however, that YRMC began to disclose that its systems had been hacked, compromising the personal and health care information of approximately 700,000 past and current patients.

---

[3] Yuma Regional Medical Center, Notice of Privacy Practices (Sep. 2020), available at https://www.yumaregional.org/EmergeWebsite/media/Yuma-Documents/NoticePrivacyPracticesEnglish.pdf (last accessed Jun. 15, 2022).
[4] HIPAA Journal, "700,000 Patients Affected by Yuma Regional Medical Center Ransomware Attack" (Jun. 13, 2022), available at https://www.hipaajournal.com/700000-patients-affected-by-yuma-regional-medical-center-ransomware-attack (last accessed Jun. 15, 2022).

O'STEEN & HARRISON
ATTORNEYS AT LAW

11.     Plaintiff was provided notice of its breach by letter dated June 9, 2022 stating, in pertinent part:

> The data involved varied based on the individual, but included your name and at least one or more of the following: Social Security number, health insurance identification number, demographic information, and/or limited medical information related to your care. Your electronic medical record was not involved during the incident.

12.     YRMC's disclosure of this cyber-attack further claims that YRMC discovered the attack on April 25, 2022.

13.     The cyber-attack inflicted upon YRMC and the consequent theft of confidential and highly sensitive information is the direct and proximate result of Defendant's failure to adequately implement cyber security measures in accordance with Defendant's duties, which they were required to undertake by virtue of the fact that they are a storehouse of vast quantities of sensitive patient data of individuals who have no choice but to provide that data to them in order to receive services.

14.     In a breach situation, it is essential and incumbent upon the breached company to provide accurate and complete information to those at risk so that they may immediately protect themselves and their families from further harm. To date, YRMC has not yet fully and adequately informed those affected of the precise scope of the theft or the nature of the risk of the risk of identity theft. While Plaintiff has been notified, it remains unclear how many other victims YRMC has notified.

15.     As a consequence of YRMC's breach of its duties and other violations, failing to adequately safeguard and protect the sensitive information in its possession, custody and control from breach, and its failure to adequately warn Plaintiff and other class members of the inadequacies with respect to its cyber security, thus exposing them to further harm, Plaintiff and Class Members shall henceforth live in fear of identity theft caused by YRMC's profound lack of data security systems and controls and shall be required to expend monies to try and protect themselves from identity theft, albeit perhaps much too late as a consequence of YRMC's misfeasance and breach of

duty.

16.    This action seeks redress and compensation for the harm caused to Plaintiff and the other Class Members by virtue of YRMC's failures to protect confidential information.

17.    Plaintiff requests damages to compensate for current and future losses, as well as injunctive relief to provide safeguards against another failure of YRMC's cyber security systems.

18.    In addition, while Plaintiff recognizes that YRMC is extending a free, one- year credit monitoring to those affected by the cyber-attack, this is wholly inadequate to protect against future attacks and use of Plaintiff's and class members' personal and sensitive information, or otherwise provide for the security of such information, particularly where it includes the information of minor children and the elderly. Plaintiff thus seeks relief compelling YRMC to provide full and adequate credit monitoring services and data protection services that will be effective and proactively guard against future identity theft and fraud, in addition to seeking damages for the harm that has already been caused by YRMC.

## II.    PARTIES

19.    Plaintiff Charles Chacon is a citizen and resident San Jacinto, California. Plaintiff received a letter from YRMC dated June 9, 2022, informing him that he was victimized by a cyber-attack that may have affected the security of his personal and protected information. Plaintiff believes that the data breach that is the subject of this lawsuit has affected the security of his personal and protected information. Since the data breach, Plaintiff now lives in fear of unauthorized misuse and exploitation of his confidential information, theft and related financial fraud and resulting harm. Plaintiff has spent and will spend time and money safeguarding his personal and private information from continued cyber-attack, mindful that Plaintiff's information continues to remain at high risk for fraud, including continuing identity theft, and the continuing risk of being victimized by reason of YRMC's conduct.

20.    Defendant Yuma Regional Medical Center ("YRMC") is a non-profit corporation that is incorporated in the State of Arizona with its principal place of business located at 2400 S. Avenue

O'STEEN&HARRISON
ATTORNEYS AT LAW

A, Yuma, Arizona 85364. For the fiscal year ended December 31, 2019, YRMC reported that it had $582.93 Million in total revenues, along with $548.70 Million in operating expenses.

### III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which some Class Members are citizens of states different than Defendant. *See* 28 U.S.C. § 1332(d)(2)(A). This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

22.    This Court has personal jurisdiction over the Defendant. Defendant has sufficient minimum contacts with the State of Arizona and intentionally avail itself of the consumers and markets within the State through the promotion, marketing, and sale of its health, medical and other services.

23.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(a)(2) because Defendant conducts substantial business in this district, is headquartered in this district, and is deemed to be citizens of this district. A substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

### IV.    FACTUAL BACKGROUND

#### A.    Healthcare Data Breaches Swell Amid Hacking Surge

24.    Underground hacker markets are booming. According to an article published in April 2016 by DELL SecureWorks, entitled *Underground Hacker Market*s, before the cyber-attack on YRMC, markets are booming with counterfeit documents to further enable fraud, including new identity kits, passports, utility bills, Social Security cards and drivers' licenses. Medical identity theft continues on the rise because it pays. In black market auctions, complete patient medical records fetch high prices. The underground hacker markets are monetizing every piece of data they can steal or buy and are continually adding services so other scammers can successfully carry out online and in person fraud.

O'STEEN & HARRISON
ATTORNEYS AT LAW

25.     Indeed, such information about customers tends to be more valuable on the black market than the credit card information often stolen from retailers. Stolen medical information can also be used to make false insurance claims. The combination of social security information and a patient's medical history constitutes a valuable commodity to criminals.

26.     According to Mac McMillan, chief executive of information security firm CynergisTek, cyber criminals target healthcare companies because "the industry is pretty much easy pickings, and they're hitting it because they're getting paid.[5]"

27.     "Experts say the increased hacking can be attributed to the health care industry's rapid move to digital, particularly amid the Covid-19 pandemic; an increase in remote work, which allows more avenues for attacks with employees using more personal devices; the financially lucrative information for cybercriminals in health care; and greater awareness of attacks across the industry, thus more reporting.".[6]

**B.     The FBI Provides a Dire Warning to the Healthcare Industry**

28.     The push to digitize patient health records in hospitals and doctors' offices has also made medical records increasingly vulnerable. According to security experts, moving medical records from paper to electronic form has made patient records more susceptible to breaches, including criminal attack. "The healthcare industry has become … a much bigger target," according to Daniel Nutkas, the Chief Executive of Health Information Trust Alliance, an industry group that works with healthcare organizations to improve their data security.[7] Despite this, healthcare providers have lagged far behind other industries according to experts. "When we go to a healthcare

---

[5] Ben Lonard, *Health data breaches swell in 2021 amid hacking surge, POLITICO analysis finds*, POLITICO (Mar. 23, 2022) https://www.politico.com/news/2022/03/23/health-data-breaches-2021-hacking-surge-politico-00019283.
[6] Ben Lonard, *Health data breaches swell in 2021 amid hacking surge, POLITICO analysis finds*, POLITICO (Mar. 23, 2022) https://www.politico.com/news/2022/03/23/health-data-breaches-2021-hacking-surge-politico-00019283.
[7] Reed Ableson, *Data Breach at Anthem May Lead to Others*, N.Y. TIMES (Feb. 6, 2015) https://www.nytimes.com/2015/02/07/business/data-breach-at-anthem-may-lead-to-others.html

O'STEEN & HARRISON
ATTORNEYS AT LAW

show and you look at the screens of different systems, it's like we're looking at Windows XP," said Bob Janacek, a co-founder and chief technology officer of DataMotion, an email encryption and health information service provider. "You go to a banking show and they're talking about how to slice a billionth of a second off a transaction to get a competitive edge, it's just totally different." *Id*.

29.    Healthcare companies were specifically warned by the Federal Bureau of Investigation in 2020 of the increasing threat to them from hackers. That same year, about 67% of healthcare organizations reported that they had at least one data breach over the last two years, according to a survey of healthcare providers published last year by the Ponemon Institute, a privacy and data protection research firm.

### C.    YRMC Fails to Adequately Secure Confidential Information or Protect it from Theft

30.    YRMC was unquestionably aware of the importance that its patients and others placed on privacy, as well as its own duty to safeguard the personal information that was supplied to it, and to promptly notify victims of any data breach of its systems. Defendant as obliged to use every means available to protect private and confidential data, including social security numbers, from falling into the hands of criminals or hackers, and they knew it.

31.    YRMC's Notice of Privacy Practices, represents that it "is committed to protecting the confidentiality of information about you, and is required by law to do so." The most recent version of this notice was effective starting September 2020.[8]

32.    YRMC, as a "Covered Entity" under HIPAA, has special obligations to protect the PHI of its patients and members of its healthcare plans. These obligations include compliance with both the "Privacy Rule" and the "Security Rule." The Privacy Rule requires YRMC to maintain administrative, physical, and technical safeguards to ensure the protection of PHI. The Security Rule

---

[8] Yuma Regional Medical Center, Notice of Privacy Practices (Sep. 2020) available at https://www.yumaregional.org/EmergeWebsite/media/Yuma-Documents/NoticePrivacyPracticesEnglish.pdf (last accessed Jun. 15, 2022).

O'STEEN & HARRISON
ATTORNEYS AT LAW

requires YRMC to protect against reasonably anticipated threats to the security of PHI.

33.     Indeed, YRMC was required to protect customers' PII and PHI by adopting and implementing appropriate data security protocols and practices, including as set forth under HIPAA, the HITECH Act, applicable state law, and common law.

34.     YRMC is also prohibited under the Federal Trade Commission Act, 14 U.S.C. § 45 from engaging in unfair and deceptive acts or practices. In fact, the Federal Trade Commission has previously determined that a company's failure to maintain reasonable and appropriate data security for PII is an "unfair practice" under the Act.

35.     YRMC has had the means and ability to achieve adequate cyber-security. YRMC could have encrypted patient's confidential and sensitive information into coded strings that would not be immediately useful or identifiable to cyber thieves, but failed to do so. YRMC also failed to segregate systems and servers containing the PII and PHI of patients. Plaintiff is informed, believes and hereupon alleges that YRMC failed to take these steps and many others that would have guarded the confidential information in its possession from attack and theft.

36.     In truth, YRMC was not particularly concerned with protecting its former and current patients from identity theft. YRMC simply did not want to spend the money to do it right, sacrificing data security on the altar of corporate profits and financial results. Unfortunately, YRMC's "ho-hum attitude" toward cyber theft reflects a dangerous and reckless attitude: companies view corporate security breaches as so frequent and ubiquitous that they have become little more than a routine cost of doing business.

37.     Simply put, businesses like YRMC, including healthcare companies, harbor a reckless attitude while shunning the necessary steps that must be taken in order to truly achieve cyber security. "Companies are getting off relatively unscathed," said Paul Stevens, Director of Policy and Advocacy for the Privacy Rights Clearinghouse in San Diego, adding, "they provide some credit

monitoring to placate customers, but they have no real incentive to do better."[9]

**D.     Confidential Information and Data is Breached and Accessed Due to YRMC's Misconduct**

38.     On or about April 21, 2022, hackers infiltrated YRMC's internal systems obtaining, among other things, SSNs, health insurance identification number, demographic information medical information. Plaintiff is informed and believes and, further based on the press releases and public statements by YRMC, thereupon alleges that the hackers who breached YRMC's network were able to access YRMC's larger information systems, which in turn gave the hackers access to patient's PII and PHI. Patient information that was accessed includes patient information, including names, SSNs, health insurance information and medical information.[10]

39.     The YRMC cyber-attack appears to be the fifth largest breach of publicly tracked by U.S. Department of Health and Human Services Office for Civil Rights for the year 2022, which monitors a list of breaches of healthcare information since September 2009. The list reports 283 breaches since January 1, 2022.

**E.     The Ongoing Harm Arising from the YRMC Cyber Attack and Data Breach**

40.     The compromised data leaves YRMC patients and victims continuously vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more. These types of data breaches can result in numerous adverse consequences because the hackers and the parties to whom such information is sold can commit fraud that lasts over a long period of time. Identity theft utilizing PII and PHI is qualitatively and quantitatively different than the loss of one's credit card. Social security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

---

[9] David Lazarus, *Wall Street's reaction to Anthem data breach: ho hum*, LA TIMES (Feb. 5, 2015) https://www.latimes.com/business/la-fi-lazarus-20150206-column.html

[10] Yuma Regional Medical Center, "Notice of Security Incident" available at https://www.yumaregional.org/EmergeWebsite/media/Yuma-Documents/Yuma-Regional-Medical-Center-Notice.pdf (last accessed Jun. 15, 2022).

O'STEEN&HARRISON
ATTORNEYS AT LAW

41.     The Social Security Administration has warned that identity thieves can use an individual's SSN and good credit score to apply for additional credit lines. This type of fraud can go undetected until debt collection calls commence months or even years later.[11]

42.     Stolen SSNs also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her SSN was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. This, in turn, may cause conflict or suspicion between an employer and employee, and may trigger investigations of the employee that require time and expense to defend. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected. It can take months or years, as well as significant expense to the victim, to correct the fraud with the IRS.

43.     What is more, it is no easy task to change or cancel a stolen SSN. An individual cannot obtain a new SSN without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

44.     Even then, a new SSN may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

45.     Another danger, according to the publisher of Privacy Journal, Robert Ellis Smith, is that thieves use stolen Social Security numbers to obtain medical care in someone else's name. *Id*.

46.     In 2014 alone, medical identity fraud affected 2.3 million people — an increase of

---

[11] Social Security Administration, "Identity Theft and Your Social Security Number" (Jul. 2021) available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jun. 15, 2022).
[12] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015) http://www.npr.org/2015/02/09/384875839/data- stolen-by-anthem-s-hackers-has-millions-worryingabout-identity-theft.

O'STEEN&HARRISON
ATTORNEYS AT LAW

twenty-one percent over the previous year. Ponemon Institute's February 2015 "Fifth Annual Study on Medical Identity Theft" found that "[u]nlike credit card fraud, victims of medical identity theft can suffer significant financial consequences. Sixty-five percent of medical identity theft victims in our study had to pay an average of $13,500 to resolve the crime. "[13] An earlier study by Ponemon found that the "average total cost" of such theft is "about $20,000" per incident.[14] That earlier study also concluded that a majority of medical-identity-theft victims were forced to pay out-of-pocket costs for healthcare they did not receive in order to regain coverage. Almost half of medical identity theft victims lose their health care coverage as a result of the theft; and nearly one-third incurred increased insurance premium cost; a staggering forty percent were never able to resolve their identity theft. *Id.* Further, the February 2015 Ponemon study found that sixty- five percent of medical identity theft victims spend an average of 200 hours to sort out the mess created by the medical identity theft, including working with insurers and healthcare providers to secure their credentials, verifying personal information, and ensuring their records are accurate. Only ten percent "report achieving a completely satisfactory conclusion of the incident."[15]

47. Moreover, fraudulent medical treatment can have non-financial impacts as well. Deborah Peel, executive director of Patient Privacy Rights, has described scenarios in which an individual may be given an improper blood type or administered medicines because his or her medical records contain information supplied by an individual obtaining treatment under a false name.[16]

---

[13] Ponemon Institute, "Fifth Annual Study on Medical Identity Theft" (Feb. 2015) available at http://www.medidfraud.org/wp-content/uploads/2015/02/2014_Medical_ID_Theft_Study1.pdf (last accessed Jun. 15, 2022).
[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 210) http://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.
[15] Ponemon Institute, "Fifth Annual Study on Medical Identity Theft," note 12, *supra.*
[16] Andrea Peterson, *2015 is Already the Year of the Health-Care Hack—and It's Only Going to Get Worse*, WASHINGTON POST (Mar. 20, 2015) https://www.washingtonpost.com/news/the-switch/wp/2015/03/20/2015-is-already-the- year-of-the-health-care-hack-and-its-only-going-to-get-worse.

O'STEEN & HARRISON
ATTORNEYS AT LAW

48.     The victims of the YRMC breach are also now at heightened risk of health insurance discrimination. Stolen medical and clinical information may be improperly disclosed for use to discriminate in the provision of healthcare to insureds and prospective insureds. Individuals risk denial of coverage, improper "redlining," and denial or difficulty obtaining disability or employment benefits because information was improperly disclosed to a provider. This risk is pervasive and widespread. Indeed, most states maintain government agencies that investigate and combat health insurance discrimination, as does the Office for Civil Rights in the Department of Health and Human Services.

49.     The danger of identity theft is compounded when a minor's SSN and personal information is compromised. Whereas adults can periodically monitor their own credit reports, minors typically have no credit to monitor. Thus, it can be difficult to safeguard against fraud. Thieves who steal a minor's identity may use it for years before the crime is discovered.

50.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cyber security firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[17]

51.     This estimate may be low. A recent PricewaterhouseCoopers report stated that an identity theft kit containing health insurance credentials can be worth up to $1,000 on the black market, while stolen credit cards may go for $1 each.

52.     The implications of the YRMC data breach are indeed serious. But these implications were known ex ante. YRMC should have — and could have — done more to fulfill its duty to safeguard the data with which its customers entrusted it. It could — and should — do more to protect its customers now that a breach has occurred.

---

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT World, (Feb. 6, 2015 ) http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for10x- price-of-stolen-credit-card-numbers.html.

O'STEEN&HARRISON
ATTORNEYS AT LAW

**F.      Even After the Breach, YRMC Fails to Take Adequate Steps to Minimize Harm**

53.      YRMC has announced that it will offer free credit monitoring services for one year. Credit monitoring — and certainly only for one year — is entirely inadequate given the breadth of information stolen and is entirely insufficient to address the harm suffered by the victims of YRMC's conduct.

54.      As observed by the Ponemon Institute, a victim of medical identity theft typically does not learn of the fraudulent treatment for months.  YRMC's proposed customer solutions do nothing to address the problem of medical identity theft, and YRMC has, as yet, done nothing to advise its customers how to obtain and inspect their medical records for fraud to comport with best practices identified by security experts.

55.      YRMC's professed "monitoring" of one of the three major credit reporting bureaus leaves unattended two-thirds of the sources from which identity theft can be detected. One year of monitoring is inadequate for victims whose compromised PII includes an entire package of identity information with Social Security numbers, and who face substantial risk of identity theft for years after the "monitoring" expires.

56.      In order to guard against medical identity fraud, cybersecurity experts suggest that individuals routinely obtain the most recent copies of their medical records and inspect them for discrepancies. However, YRMC has done nothing to inform and encourage its patients to obtain and inspect their medical records for fraud or follow best practices identified by security experts. YRMC has not even offered to reimburse any costs associated with obtaining medical records or for their review.

57.      YRMC's delayed notice to Class members means that approximately 45 days after their PII and PHI was stolen elapsed before Class members had the opportunity to use these services (or even know their PII and PHI is at risk). This came far too late. By then, Plaintiff's and class members' PII and/or PHI may already have been sold to criminals and identity theft may already



have occurred or be well underway.

58.    Credit monitoring does very little to protect against tax or insurance fraud, or to prevent imposters from obtaining medical treatment or prescription drugs fraudulently. YRMC offers its customers nothing to guard against these reasonably foreseeable threats. As security blogger Brian Krebs has explained, however, "the sad truth is that most services offer little in the way of real preventative protection against the fastest-growing crime in America [identity theft]."[18] Credit monitoring services, in other words, may inform individuals of fraud after the fact, but do little to thwart fraud from occurring in the first instance. Moreover, these services do very little to defend against medical identity theft or misuse of SSNs for non-financial fraud.

59.    "Companies are getting off relatively unscathed," said Paul Stevens, Director of Policy and Advocacy for the Privacy Rights Clearinghouse in San Diego, adding, "they provide some credit monitoring to placate customers, but they have no real incentive to do better."[19] Simply put, businesses like YRMC harbor a reckless attitude while shunning the necessary steps that must be taken in order to truly achieve cyber security because those steps tend to slow things down and harm productivity.

60.    Further, upon information and belief, the three major credit reporting bureaus maintain websites that are difficult to navigate for the average user and often unclear as to what is provided as a free service and what is not a free service. Upon information and belief, in attempt to protect to safeguard their credit report, many members of the Class will pay for reporting services that are not needed because they simply do not understand the process, and YRMC has not offered sufficient guidance to navigate this process.

61.    In sum, many Class members have or will incur out-of-pocket expenses either to

---

[18] Brian Krebs, "Are Credit Monitoring Services Worth It?" Krebs on Security (Mar. 19, 2014) http://krebsonsecurity.com/2014/03/are-credit-monitoring-services- worth-it/ (last visited June 15, 2022).

[19] David Lazarus, *Wall Street's reaction to Anthem data breach: ho hum*, LA TIMES (Feb. 5, 2015) https://www.latimes.com/business/la-fi-lazarus-20150206-column.htm

address or to prevent identity theft or to secure protection against the potential for the identity theft and medical-identity theft to which YRMC has exposed them. These out-of-pocket expenses include fees for things such as changing bank accounts, obtaining replacement checks, changing credit cards, obtaining credit reports, phone charges, postage, and the costs of obtaining adequate credit monitoring and identity theft insurance. YRMC is liable for all such costs and expenses.

## V.    CLASS ACTION ALLEGATIONS

62.    Plaintiff bring this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

63.    The proposed nationwide class is defined as:

> All former or present YRMC Health patients who had their personal, medical financial, or other sensitive information compromised as a result of the data breach of YRMC Health's computer servers that began on April 25, 2022.

64.    Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) governmental entities. Plaintiff reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses or modified in any other way.

### A.    Numerosity and Ascertainability

65.    Although the exact number of Class Members is uncertain and can be ascertained only through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in YRMC's possession, custody, or control.

O'STEEN &amp; HARRISON
ATTORNEYS AT LAW

**B.    Typicality**

66.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all class members, entrusted personal and health information to YRMC in connection with healthcare services or treatment. Plaintiff, like all Class Members, have been damaged by YRMC's conduct in that their personal and health information, including SSNs and clinical information, has been compromised by YRMC's failure to fulfill its duties under the law. Further, the factual bases of YRMC's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

**C.    Adequate Representation**

67.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer and data breach class actions, and therefore Plaintiff's counsel is also adequate under Rule 23.

68.    Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor their counsel have interests adverse to those of the Class.

**D.    Predominance of Common Issues**

69.    There are numerous questions of law and fact common to Plaintiffs and the Class Members that predominate over any question affecting only individual Class Members. The answers to these common questions will advance resolution of the litigation as to all Class Members. These common questions of law and fact include:

- whether Defendant engaged in the wrongful conduct alleged herein;
- whether Defendant owed a duty to Plaintiff and Class Members to adequately protect their medical, financial and personal information and to provide timely and accurate notice of the data breach to Plaintiff and the Class;
- whether Defendant breached its duties to Plaintiff and the Class;
- whether Defendant knew or should have known that its computer and network systems

O'STEEN & HARRISON
ATTORNEYS AT LAW

were vulnerable to attack from hackers;

- whether YRMC's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its computer and network systems, resulting in the loss of patients' medical, financial and personal information;

- whether YRMC failed to adequately or timely inform Plaintiff and Class Members that it did not maintain cyber security protocols and procedures sufficient to reasonably safeguard consumer financial and personal data; whether YRMC failed to inform Plaintiff and Class Members of the data breach in a timely and accurate manner;

- whether YRMC violated federal and state laws, such as HIPPA, thereby breaching its duties to Plaintiff and Class Members;

- whether Plaintiff and Class Members suffered injury as a proximate result of YRMC conduct or failure to act; and

- whether Plaintiff and Class Members are entitled to recover damages, equitable relief and other relief, and the extent of the remedies that should be afforded to Plaintiffs and Class Members.

## COUNT I

## (NEGLIGENCE)

70.    Plaintiff hereby incorporates by reference the allegations contained in the proceeding paragraphs as if fully alleged at length herein.

71.    Plaintiff bring this claim on behalf of a Nationwide Class.

72.    YRMC required Plaintiff and Class Members to provide it with non-public personal and health information in order to receive healthcare services. YRMC collected and stored this data.

73.    YRMC owed Plaintiff and all Class Members a duty of reasonable care in the handling, maintenance and security of their PII and PHI. This duty included taking reasonable measures to prevent disclosure of the information and reasonable measures to guard the information from cyber-attacks.

O'STEEN & HARRISON
ATTORNEYS AT LAW

74.    YRMC was required to secure and safeguard the personal and health information of Plaintiff and Class Members, to prevent disclosure of the information, and to guard the information from theft. YRMC was further under a duty in a responsibility to implement a process by which could detect a breach of its security systems in a reasonably expeditious period of time so that it could respond, remedy and promptly notify affected individuals in the event of a security breach. YRMC was further required to maintain PII and PHI in its networks only as long as necessary and required by law.

75.    YRMC knew or should have known that the risk in collecting and storing the medical, financial and personal information of Plaintiff and Members of the Class and of the critical importance of providing adequate security of that information.

76.    YRMC's duties arise from the common law, the state statutes cited in this Complaint, the Federal Trade Commission Act and the following HIPAA regulations:

    a.    45 C.F.R. § 164.306(a)(1) for failing to ensure the confidentiality and integrity of electronic PHI that YRMC created, received and maintained from Plaintiff and Class members.

    b.    45 C.F.R. § 164.306(a)(2) for failing to protect against reasonably anticipated threats or hazards to the security or integrity of the electronic PHI of Plaintiff and Class members;

    c.    45 C.F.R. § 164.306(a)(3) for failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules regarding individually identifiable health information;

    d.    45 C.F.R. § 164.306(a)(4) for failing to ensure compliance with the HIPAA security standard rules; and

    e.    45 C.F.R. § 164.308(a)(1)(i) for failing to implement policies and procedures to prevent, detect, contain and correct security violations.

77.    YRMC breached its duty of care by failing to secure and safeguard the personal and

O'STEEN&HARRISON
ATTORNEYS AT LAW

health information of Plaintiff and the Class. YRMC negligently maintained systems that it knew were vulnerable to a security breach. While it was made aware of those vulnerabilities including knew or should have known of such vulnerabilities, it wholly failed to rectify them or take steps to safeguard the information in a timely fashion. Further, YRMC negligently stored financial and health information unencrypted on the same database, making it more likely that a breach would make a (greater and more dangerous) of personal information.

78.    Plaintiff and Class Members have suffered harm as a result of YRMC's breach of duty. The personal and health information that Plaintiff and Class Members have been exposed, subjecting each Class Member to identity theft, credit and bank fraud, social security fraud, tax fraud, medical identity fraud and a million of other varieties of identity fraud.

79.    Plaintiff and Class Members have suffered monetary damages and will continue to be injured and incur damages in the future both in an effort to protect themselves and to remedy acts of fraudulent activity. Plaintiff and Class Members have suffered and such are reasonably likely to suffer theft of personal health information; costs associated with prevention, detection and litigation of identity theft; costs associated with time spent and productivity loss resulting from addressing the consequences of fraud in any of its myriad form; and damages from the exposure of their PHI due to YRMC's misconduct and breach.

**COUNT II**

**(NEGLIGENCE PER SE; HIPAA, THE FTC ACT)**

80.    Plaintiff hereby incorporate by reference the allegations contained in the proceeding paragraphs as if fully alleged at length herein.

81.    YRMC required Plaintiff and Class Members to provide it with confidential and private PII and PHI in order to provide healthcare services, health insurance, or other services to Plaintiff and Class Members.

82.    Based on those requirements and in order to obtain services from YRMC, Plaintiff and Class Members provided YRMC with a massive amount of PII and PHI belonging to Plaintiff and

Class Members.

83.     YRMC collected and stored this information and knew, or should have known, of the risks inherent in collecting and storing the PII and PHI of Plaintiff and Class Members.

84.     Pursuant to HIPAA, 42 U.S.C. § 1320d et seq., YRMC had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' PII and PHI.

85.     Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, YRMC had a duty to provide fair and adequate computer systems and data security practices in order to safeguard Plaintiff's and Class Members' PII and PHI.

86.     Through its acts and omissions, including those described above, YRMC violated its obligations under HIPAA and the Federal Trade Commission Act.

87.     YRMC's failure to comply with its duties under these acts breached its duty of reasonable care to Plaintiff and Class Members and constituted negligence per se.

88.     YRMC's actions were the direct and proximate cause of harm to Plaintiff and Class Members. But for YRMC's actions and failures to act, Plaintiff and the Class Members would not have been injured and their PII and PHI would have been secure.

89.     Plaintiff's injuries and those of the Class Members were reasonably foreseeable as a result of YRMC's breach of its duties to Plaintiffs and Class Members. YRMC knew or reasonably should have known that its breach of its duties would put Plaintiff's and Class Members' PII and PHI at risk and the failure to adequately protect that information would harm Plaintiff and Class Members.

90.     As a direct and proximate result of YRMC's breaches of its duties, Plaintiff and Class Members have suffered harm because, among other things, their PII and PHI has been exposed, imminently subjecting each Class Member to identity theft, credit and bank fraud, social security fraud, tax fraud, medical identity fraud and other varieties of identity fraud.

91.     Plaintiff and Class Members have suffered monetary damages and/or will incur monetary damages in the future both in an effort to protect themselves and to remedy acts of fraudulent activity. Plaintiff and Class Members have suffered, and/or face an imminent risk of

suffering, the theft of their credit identity and medical identities; costs associated with prevention, detection, and mitigation of identity theft, medical identity theft, and/or fraud; costs associated with time spent and productivity loss resulting from addressing the consequences of, or preventing, fraud in any of its forms; and damages from the unconsented exposure of PII and PHI due to this breach.

**COUNT III**

**(NEGLIGENT MISREPRESENTATION)**

92.    Plaintiff hereby incorporate by reference the allegations contained in the proceeding paragraphs as if fully alleged at length herein.

93.    YRMC negligently and recklessly misrepresented material facts pertaining to the provision of health services to Plaintiff and Class Members by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's and Class Members' personal and sensitive information from unauthorized disclosure, release, data breaches and theft.

94.    YRMC negligently and recklessly misrepresented facts pertaining to the sale of health services to Plaintiff and Class Members by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiff's and Class Members' personal information.

95.    Because of the inadequacy of their security systems and data protection systems, YRMC either knew or should have known that their representations were not true.

96.    In reliance upon these misrepresentations, Plaintiff and Class Members purchased health services from YRMC.

97.    Had Plaintiff and Class Members, as reasonable persons, known YRMC's inadequate data privacy and security practices, or that YRMC was failing to comply with the requirements of federal and state laws pertaining to the privacy and security of personal information, they would have not purchased health benefits services from YRMC, and would not have entrusted their personal information to YRMC.

98.    As direct and proximate consequence of YRMC's negligent misrepresentations, Plaintiff and Class Members have suffered the injuries alleged herein.

## COUNT IV

## (UNJUST ENRICHMENT)

99.    Plaintiff hereby incorporate by reference the allegations contained in the proceeding paragraphs as if fully alleged at length herein.

100.    Plaintiff and Class Members conferred a monetary benefit on YRMC in the form of monies paid for the purchase of health benefits services.

101.    YRMC appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Class Members.

102.    The monies for health benefits services that Plaintiff and Class Members paid (directly or indirectly) to YRMC were supposed to be used by YRMC, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

103.    As a result of YRMC's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between health benefit services with the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and the inadequate health services without reasonable data privacy and security practices and procedures that they received.

104.    Under principals of equity and good conscience, YRMC should not be permitted to retain the money belonging to Plaintiff and Class Members because YRMC failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal, state and local laws, and industry standards.

105.    YRMC should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it.

**O'STEEN** & **HARRISON**
ATTORNEYS AT LAW

## COUNT V

## (BREACH OF FIDUCIARY DUTY)

106.    Plaintiff hereby incorporate by reference the allegations contained in the proceeding paragraphs as if fully alleged at length herein.

107.    YRMC collected and stored highly personal and private information, including health information, belonging to Plaintiff and Class Members. Because this information is of a heightened sensitivity and importance, it receives special protection under federal law. Indeed, HIPAA protects all "individually identifiable health information," as well as individual identifiers such as social security numbers and medical identification numbers. *See*, *e.g*., 45 C.F.R. § 160.103. What is more, HIPAA imposes heightened duties on entities like YRMC that collect and store such information, subjecting them to a range of penalties when protected health information is wrongfully disclosed. *See*, *e.g*., 42 U.S.C. §§ 1320d-5, 1320d-6.

108.    By virtue of its collection of highly personal information, including health information, and the warranties made in its Notice of Privacy Practices, a fiduciary relationship arose between YRMC and the Plaintiff and Class Members that is actionable at law.

109.    By virtue of this fiduciary relationship, YRMC owed Plaintiff and Class Members a fiduciary duty to safeguard the personal and health information that it collected and stored; to warn Plaintiff and Class Members when it learned that the security of the collected data may be vulnerable; and to immediately and fully notify Plaintiff and the Class Members when it knew that its cyber security systems had been breached. This duty required YRMC to ensure that the interests of Plaintiff and Class Members would be adequately cared for, both before and after the security breach. By virtue of its duty, YRMC owes Plaintiff and Class Members assistance in protecting themselves now that a breach has occurred, not just from financial fraud, but also from medical identity fraud, health insurance discrimination, tax fraud, and other forms of identity fraud described herein.

110.    As a result of YRMC's breach of its fiduciary duties, Plaintiff and Class Members have suffered actual damages, and prospective damages that are reasonably likely to arise. YRMC

O'STEEN & HARRISON
ATTORNEYS AT LAW

has taken insufficient steps to protect the Class from these reasonably likely prospective damages, and Plaintiff and Class Members therefore also request equitable and/or injunctive relief to require YRMC to take steps to prevent the forms of identity fraud alleged herein.

**COUNT VI**

**(VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT) ARIZ. REV. STAT. §§44-1521, ET SEQ. ("ACFA")**

111.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully alleged at length herein.

112.    Arizona Revised Statute §§ 44-1521, et seq. ("ACFA") provides in pertinent part as follows:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

Id. § 44-1522.

113.    Plaintiff and Class Members are "persons" as defined by ARIZ. REV. STAT. § 44-1521(6), YRMC provides "services" as that term is included in the definition of "merchandise" under ARIZ. REV. STAT. § 44-1521(5), and YRMC is engaged in the "sale" of "merchandise" as defined by ARIZ. REV. STAT. § 44-1521(7).

114.    YRMC's aforesaid conduct constituted deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA.

115.    In addition, YRMC's failure to disclose that its computer systems were not well-protected against cyber-attack or data breach even after the healthcare community was warned by the FBI and on notice, and that Plaintiff's and Class Members' sensitive information was vulnerable

and susceptible to intrusion and cyber-attack, constitutes deceptive and/or unfair acts or practices. YRMC knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and Class Members; and (b) defeat Plaintiff's and Class Members' ordinary, foreseeable and reasonable expectations concerning the security of YRMC's computer servers.

116.    Defendant intended that Plaintiff and Class Members rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with YRMC's offering of medical services and incorporating Plaintiff's and Class Members' sensitive information on its computer servers, in violation of the AFCA.

117.    YRMC also engaged in unfair acts and practices in connection with the sale of health services by failing to maintain the privacy and security of Plaintiff's and Class Members' personal information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1320d et seq.), and the Gramm Leach-Bliley Act (15 U.S.C. § 6801), and the Arizona Insurance Information and Privacy Protection Act (ARIZ. REV. STAT. § 20-2113).

118.    YRMC's wrongful practices occurred in the course of trade or commerce and were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of YRMC that applied to Plaintiff and Class Members and were repeated continuously before and after YRMC obtained confidential medical, financial, and personal data concerning Plaintiff and Class Members. All Class Members have been adversely affected by YRMC's conduct and the public was and is at risk as a result thereof.

119.    As a result thereof, Plaintiff and Class Members were injured in their business or property YRMC's unfair and/or deceptive conduct proximately caused Plaintiff's and Class members' injuries because, had YRMC maintained the sensitive information with adequate security, Plaintiff and Class Members would not have lost it.

120.    Plaintiff and Class Members seek actual damages, compensatory, punitive damages,

injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the AFCA.

**PRAYER FOR RELIEF**

Plaintiff, on behalf of himself and all others similarly situated, request the Court enter judgment against Defendant, as follows:

A.      An order certifying the proposed Class, designating Plaintiff as the named representative of the Class, and designating the undersigned as Class Counsel;

B.      An order awarding Plaintiff and the Class relief, including actual and statutory damages, as well as equitable and/or injunctive relief as requested herein;

C.      An injunction ordering Defendant to immediately notify each individual whose personal information was compromised and/or an order awarding Plaintiff and the Class preliminary or other equitable or declaratory relief as may be appropriate by way of applicable state or federal law and as requested herein;

D.      Any additional orders or judgments as may be necessary to prevent further unlawful practices and to restore to any person in interest any money or property that may have been acquired by means of the violations;

E.      An award of attorneys' fees and costs, as provided by law;

F.      An award of pre-judgment and post-judgment interest, as provided by law;

G.      Leave to amend this Complaint to conform to the evidence produced at trial; and

H.      Any other favorable relief as may be available and appropriate under law or at equity.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

**O'STEEN & HARRISON**
ATTORNEYS AT LAW

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any

and all issues in this action so triable of right.

Respectfully Submitted,

DATED this 17 day of August, 2022.

        **O'STEEN & HARRISON, PLC**

        _____
        Lincoln Combs
        *Attorneys for Plaintiff*

        **BRADLEY/GROMBACHER LLP**

        */s/Marcus J. Bradley w/permission*
        Marcus J. Bradley, Esq.
        Kiley L. Grombacher, Esq.
        Lirit A. King, Esq.
        *Attorneys for Plaintiff and the Proposed Class*
        *Pro Hac Vice Pending*